# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | NO.    A-25-CR-00332 (ADA) |
| | § | |
| JAMES WESLEY BURGER | § | |

## MOTION TO SUPPRESS STATEMENTS

TO THE HONORABLE UNITED STATES DISTRICT JUDGE ALAN D. ALBRIGHT:

On the morning of February 28, 2025, as James Burger was getting into his uncle's car to be driven to Round Rock High School, two dozen armed FBI agents wearing tactical gear surrounded his home to execute a search warrant.  James was 18, in his senior year of high school, and had never been arrested before. For the next 11½ hours, a team of FBI agents interrogated James without providing *Miranda* warnings and without telling him he was free to leave or to terminate the interview. Because the statements he made during this interrogation were obtained in violation of the Fifth Amendment to the U.S. Constitution, they must be suppressed.

In support of his motion, James shows as follows:

## I.    Factual Background[1]

On February 27, 2025, U.S Magistrate Judge Mark Lane signed a search warrant for the house where James Burger lived. The home belonged to James's uncle and aunt. James is an eighteen-year-old high school student. The affidavit in support of the search warrant application explained that the FBI was investigating potential threats to attack a Christian concert in the Austin, Texas area.

---

[1] This summary comes from a review of the Body-Worn Camera footage, audio recordings of the interrogation, an interview transcript produced by the government, and other documents produced by the government in discovery.

The FBI investigation stemmed from calls the FBI received from players of a game called Roblox. Roblox is an online social gaming platform that allows users to create games called "experiences" within a virtual universe and interact with each other through customized avatars.[2] The callers told the FBI about comments made by avatars in a particular Roblox experience called "Church." The callers expressed concern about statements made by two avatars in the game, one named "Ghurabaah" and one named "Crazz3pain," who made statements sending Bitcoin to ISIS and expressing a desire to "deal a grievous wound upon the followers of the Cross." FBI agents subpoenaed Roblox records and traced the IP addresses of the Roblox avatars to the address where James Burger lived. On February 28, 2025, approximately twenty-four FBI agents[3] went to the home to execute the search warrant.

The agents wore bullet proof vests, tactical gear, and carried drawn assault-style rifles, in addition to other weapons.[4] FBI agents observed James and his uncle in the driveway, entering their vehicle as James's uncle prepared to drive him to school. Agents in bullet-proof vests immediately surrounded James and trained their assault rifles on him.[5]

---

[2] The Roblox website explains its platform as follows: "Roblox is the ultimate virtual universe that lets you create, share experiences with friends, and be anything you can imagine." *See* www.roblox.com (last visited October 13, 2025). According to its website, Roblox currently has 111.8 million users and over 6.7 million active experiences.

[3] Twenty-three agents signed in as search team personnel that day. The government produced twenty-four BWC recordings. It's unclear from body-worn camera footage whether additional state authorities assisted and were not included on the FBI log.

[4] F3097532_2025-02-28T14.30.37.576Z_796.mp4 at 1:12.

[5] As James's uncle explained to FBI agents on the scene, James does not drive or have a driver's license.



They ordered him to turn around and place his hands behind his back.[6]



---

[6] BWC F3095732_2025-02-28T14.30.37.576Z_796.mp4 at 1:21.

FBI agents immediately handcuffed James and searched him.[7]



Agents took James's phone from his pocket.[8]



---

[7] BWC F3095744_2025-02-28T14.30.42.876Z_817.mp4 at 2:15.
[8] BWC F3095744_2025-02-28T14.30.42.876Z_817.mp4 at 2:23.

Within two minutes of approaching his home, FBI agents handcuffed James and placed him in the back seat of a black, unmarked vehicle.[9]



FBI Special Agent Nicholas Mustico started questioning James. Mustico asked James, "Would you be able to give us the pin for your phone man?"  Exhibit A, Interview Transcript, at p. 2. James told Mustico he could open it with Touch ID, but Mustico asked him again for the pin. James offered three digits. Mustico told him it had to be six digits. James provided a six-digit pin verbally, and Mustico, now joined by SA Baillee with the phone in hand, told James they just wanted to "check it real quick" and "make sure the pin works and stuff like that." *Id.*

SA Mustico told James they had a search warrant for the house and a search warrant for his phone because he "may have made some threats on the Internet." *Id.* at 3. James said, "Not towards anyone, I think." SA Mustico said, "Not towards anyone? What, what threats do you think

---

[9] BWC F3095744_2025-02-28T14.30.42.876Z_817.mp4 at 2:49.

you could have made that caused all this?" James responded, "I don't know. Maybe I was like playing the video game or something, and like you know threatened somebody, is that why?" *Id.* SA Mustico then asked James what game and James told him that he has a gaming consul and plays lots of computer games. *Id.*

SA Mustico kept James handcuffed in the vehicle from 8:44 AM to 9:03 AM. SA Mustico continued to question him. Mustico told him, "Once they get the house cleared, we can un cuff you and go inside and sit down and talk a little bit more comfortable that way you're not sitting sideways in a car." *Id.* at pg. 4. Mustico did not tell James that he was not in custody, that he was not under arrest, or that he was free to leave. SA Mustico did not read James *Miranda* warnings.

At 9:03 AM, Mustico received an order to "[d]eactivate body worn cameras." *Id.* at 6. Mustico turned off his BWC, and there is no recording of what FBI agents said to James as they escorted him into the house for questioning. *Id.*

While Mustico had been questioning a handcuffed James in the back of the black SUV, other agents had surrounded Mr. Burger's uncle, Jim Best, but had not placed him in handcuffs or in a police vehicle. James's twin cousins had been escorted out of the house. Agents handcuffed neither of them. James's line of sight from the back of the SUV allowed him to see the FBI's treatment of his family members.[10]

---

[10] F3095728_2025-02-28T14.30.576Z_790.mp4 at 5:01



After agents walked James inside, video recording of the interaction resumed, but agents kept the video recording device pointed at the floor. James was not visible on camera at any point of the 11½ hour interrogation that followed.

Agents seated James at the dining room table. Noises of other agents walking around, opening and closing doors and cabinets as they searched the home can be heard for the first four hours of recorded questioning. At various points, James's uncle and cousins entered the home to grab things they needed. FBI agents did not allow James to speak to them.

Three agents—SA Mustico joined by Carletta Carter and Jacob Baillie—interrogated James, taking turns asking questions. An agent sat on either side of James at the table. Other agents periodically interrupted the interrogation to ask James to give them information about how to access various electronic devices. *Id.* at 8 (agents ask James for his thumbprint to open the phone),

21 (SA Garcia asks for his fingerprint again), 22 (agents ask James for password to a Chromebook), 27 (SA Carter asks James for the password for a different Chromebook in his backpack).

After the agents asked James background questions and learned that he was living with his aunt and uncle due to his mother's drug abuse and domestic violence in the home, agents quickly turned to his religious views. They asked James about his reversion to Islam, how he became interested in Islam, his interpretation of the Quran on various topics, which school of Islamic thought he subscribed to, whether he attended a mosque, how he prays, what Muslim communities he belonged to, how he felt about martyrdom, and his views on groups like ISIS, Hezbollah, and Al Qaeda. They interrogated him on whether he had ever sent money to any of these groups, whether he possessed firearms, and whether he had traveled abroad. They asked him whether he wanted to hurt Jews or Christians or Shia Muslims and how he felt about specific past suicide attacks like those in New Orleans and Miami.

At about 9:55 AM, an hour into the interrogation, SA Baillie spoke to SA Mustico out of James's earshot and told him, "Ok, you have a consent form? Do you have a consent form? So you need to bring his phone back in at some point and make sure you go through his phone with him. Look at all the apps that he goes onto and get usernames and passcodes to all of them so we can look at them… You know what I'm saying?" *Id.* at 25. Neither Baillie nor Mustico asked James to sign a consent form at this point.

Over two-and-a-half hours into the questioning, SA Carter and SA Mustico asked James if he "had a specific time that you said you would harm Christians at an event." *Id.* at 56. SA Mustico asked James to confirm that the "threats online" weren't mistakes, but didn't wait for an answer from James before again asking about a "specific time" for an attack. *Id.* at 57. The agents then

questioned James about his what avatars he played in Roblox. James explained that he shared the login for an avatar named Crazz3pain with another Roblox user who was like-minded in how to portray the character and the two would trade off playing. James told agents, "Nobody really is . . . uh ever . . . I guess that sincere on the Internet, huh?" *Id.* at 58.

Shortly after noon—over three hours into the questioning—SA Carter told James that she didn't feel he was being truthful about his usernames and Roblox accounts.

> CC: OK. I've been really honest with you. I think for the most part you've been honest with me. And so, because of the reason why we're here, I want to give you the opportunity to tell your story, your beliefs, and your reasoning behind things that have been to us, complaints. And I want you to be truthful, but I don't think that you've been truthful about your usernames and the information you have used to create these accounts on Roblox and Discord. So I'm giving you the opportunity to maybe rethink the questions I've already asked. Of those accounts on Roblox and Discord. So let's go back to Crazz3pain. *Id.* at 62-63.

James again stated he shared the account and told agents the purpose of his Crazz3pain character was "Dawa," or "to give guidance on Islam" as well as to play video games with friends. *Id.* at 64. James denied being the user of Crazz3pain at the time the character made the statements in the screenshots agents showed him but acknowledged that he'd had the character make similar statements in the past. *Id.*

SA Mustico, audibly frustrated with James's answers, interrupted SA Carter to give James a form titled "Acknowledgement of Penalties for False Statements to the FBI," telling him:

> NM: At this point I am going to advise you of our, the law states like it's illegal to lie to us. Uh, and I want you to go to read over it, just so you understand potential consequences of lying to us and everything. And then you can sign it. And if you don't want to sign, let me know if you verbally understand what we're telling you and I can initial it, okay? *Id.* at 67.

Twenty-seconds of silence ensued. James did not respond. SA Mustico broke the silence saying, "So would you be willing to sign, saying you understand what you read?" *Id.*

9

James finally said, "Uhhhhh, sure…" and laughed nervously.[11] *Id.*

SA Mustico told James, "Basically it's saying that if you lie to us there's all these repercussions and it's a felony to lie to FBI agents during an investigation." *Id.* SA Carter then resumed questions about the various Roblox characters. James gave the same answers as before, and less than a minute later agents again accused him of lying:

> **SA Mustico:** Now that you've read the repercussions, umm, what is, is there anything that you wanted to change from anything that you told us?
>
> **James:** Uhh, in regards to anything specifically or just?
>
> **Mustico:** Anything that you can think – anything you can think of that you may have been lying about before that you would like to correct the story on, that way we have the correct facts from you.
>
> **James:** Umm.
>
> **SA Carter:** Like I said, you are. We're just trying to get your side, want you to be truthful. We're just trying to get to the bottom of why some things are the way that they are.
>
> **James:** Um. I mean. Um. No, I mean I can't really think of anything. Um. Yeah, really. Um. I mean I'm pretty sure that's it so far. *Id.* at 68.

At 12:45 PM, SA Baillie stood next to James and asked him to show them how to find particular accounts and messages on his phone. SA Carter held James's phone, and agents asked James to scroll through it. James was not allowed to do this freely. SA Baillie gripped tightly on James's wrist as he touched the screen.

---

[11] About two hours later, when asked by SA Baillie if he'd understood the form he signed when he signed it, James said that he had not. *Id.* at 117.

10

The call to prayer sounded in the background at 12:48 pm. James asked agents if he could go pray. *Id.* at 78. SA Mustico asked him where he needed to pray because he would need to be "observable." James told agents that he usually prayed in his bedroom. The following exchange occurred:

**SA Mustico:** "Would you sign the consent form to let us like search through Roblox messages and stuff like that while you're gone?

**James:** Uh, yeah.

**SA Mustico:** We'll do that.

**SA Baillie:** And then you can go pray.

**SA Mustico:** I'll have you sign this now and then we'll take you to pray.

*Id.* at 79. Before allowing James to go pray, agents asked him for the usernames for Roblox, Discord, Instagram, Snapchat, Telegram and for all the associated passwords. They had him spell out the usernames and passwords and confirm them. This took six minutes. *Id.* at 79-85. Then SA Baillie took James to pray.

SA Baillie did not record his interaction with James when he took James out of the living room. There is no recording of James from 12:56 PM to 1:02 PM. SA Baillie took James upstairs. SA Baillie stood inside James's bedroom and watched him pray. When he finished, James asked SA Baillie if he could use the bathroom. SA Baillie told him yes, but he had to observe him. SA Baillie kept the door open and watched James in the bathroom.

When James returned, at 1:03 PM, Agent Mustico's first question to him was, "Do you feel enlightened? Do you feel like you did your duty to Allah?" *Id.* at 86. James did not respond. For the first time, agents offered James water or a snack or an energy drink, which he declined. *Id.*

11

Agents asked questions about James's usernames. They asked him if he had access to any guns. James said that he didn't. *Id.* at 88. When asked if his family had firearms, James explained his grandfather in Florida had guns and his uncle had inherited some guns from his parents and kept them in a storage unit that James didn't know the exact location of. SA Mustico told James, "Your character in Roblox says they have access to these guns . . . are they the same guns that your uncle has in storage?" James seemed confused by the question. SA Mustico insisted that James's Roblox character had claimed to have specific models of guns. He asked James again, "So why would you claim to have access to them?" James responded, "I didn't." *Id.* at 90.

Agents continued to question James about his Roblox avatars. James again explained that he shared access to certain characters with other Roblox users, that is, James and another user would share the login to an avatar and "share" control of the character by trading back and forth who was logging in and "voicing" the character in the game. The agents did not believe James. SA Carter told him:

> **SA Carter:** So, remember this. This is your second chance, okay? And I'm going to remind you of what you signed. You are solely using the name Crazz3pain on Roblox, are you not?
>
> **James:** No. And I mean, I'm going to, you know, maintain that you know. Um because they're real…realistically, we're sharing those accounts and unless I can have something that, you know, disproves what I'm saying, you know, then I don't see the purpose in the back and forth over a single account.

*Id.* at 96-97.

SA Carter told James that he needed to produce "some kind of conversation" showing her two people talking about using the same account. *Id.* James pointed her to a Discord chat that she located on his phone and scrolled through as SA Mustico continued questioning.

12

At 1:12 pm, agents shut off the recording device with video recording and the remaining seven hours of the interrogation (from approximately 1:00 PM until 8:50 PM) were audio recorded only.

Agents returned to the topic of firearms to see if James knew where his uncle stored them. SA Carter told James, "Based on these, these statements. You making the threats toward Christians, knowing where firearms are kept, having the means to get to those firearms. Do you see why we're here and why it raises concerns?" *Id.* at 103. James responded that he did not know where his uncle kept the firearms.

At about 2:30 PM, in response to agents questioning about what was going to happen to his non-Muslim family members during the end of days, James started crying.[12] *Id.* at 108. Agent Carter didn't pause her questioning. Instead, she asked James for his definition of radicalization. *Id.* Agent Mustico questioned James about teachings of a particular sheikh and told James that he was impressed with his "deep knowledge of the Muslim faith." *Id.* at 113.

At about 2:45 pm,[13] SA Baillie brought out the inventory form from the completed execution of the search warrant and told James "you sign the top . . . this is what we're taking today. Okay, this is what we're taking with us today as part of our search warrant. So it's going to be, looks like a phone, some type of bracelet, flag, a Chromebook, another iPhone and a couple letters is what it looks like. But feel free to read it. . . . And then, uh, when you're done, then all they need from you down here is you will, uh, sign here and then print your name here." *Id.* at 113.

After getting James's signature on the inventory form, SA Baillie took over the interrogation. It quickly grew more confrontational. *Id.* at p. 115-123. SA Baillie questioned James

---

[12] ZOOM0002.WAV at 1:19:47.
[13] ZOOM0002.WAV at 1:44:54.

again about whether James shared the account for Crazz3pain with another Roblox user. SA Baillie told James that he was an expert in computer science and he had proof the account had only been logged on to from one IP address. *Id.* at 115. SA Baillie told James, "Let's just be honest. We're going to talk like men. You're eighteen right? So we're going to talk like men at the table. You don't want to get jammed up, right?" *Id.* at 116.

SA Baillie brought up the Acknowledgement Form that James had signed earlier, telling him "[Y]ou signed a statement for a thousand one, right? Do you understand what that means? You read it, but do you understand?" *Id.* at 117. James laughed nervously and told Baillie that he had *not* understood what he'd signed. *Id.* SA Baillie then asked James if he'd ever heard of Martha Stewart and told him that he could "go to jail just for lying. Doesn't matter what the crime is, you go to jail for lying." *Id.* SA Baillie asked James to admit that he'd made the "threating statements" and told James, "I need you to say it." James said yes. *Id.*

SA Baillie again asked James about access to firearms, which James again denied. *Id.* SA Baillie then told James, "So your goal, just so I'm clear, is sometime within the next year, your goal or something you would like to accomplish is you is you would like to carry out some type of attack here in the United States?" James responded, "Oh no, no, no, no. I'm sorry, let me reword that." James explained he didn't know how his beliefs would evolve over time but that there's no need "to spill blood unjustly even in a time of war, you know, or without some sort of justification." *Id.* at 121.

Over the course of the day, James laughed frequently and nervously in response to almost all questions. About seven hours into the questioning, SA Baillie openly criticized him for it, stating, "You keep laughing, you keep giggling, and if it's a nervous tick, then I get it. But I'll be

honest, it's almost offensive to me because this is not laughing at all. We're talking about taking life and death . . . If I was sitting here and I was saying disparaging things about your religion and I was kind of laughing and stuff, you wouldn't be laughing, would you? Would you be upset?" *Id.* at 122. SA Baillie went on to tell James that his job is to "protect the homeland" and posed the question to James, "What is a terrorist, right? . . . But terrorists like you said can be anybody that is inflicting terror, correct?" *Id.*   SA Baillie then asked James, "So, in that sense, are you a terrorist?" *Id.* at 123. James laughed and responded, "I mean yeah, yeah. By that sense and, you know, by my very own definition, yes, I guess, you know, I would be uh, a terrorist." *Id.* at 123.

Agents continued interrogating James about his feelings on ISIS and which Muslim country he hoped to live in one day, Syria or Yemen. At this point, at approximately 3:30 pm, SA Mustico cut into SA Baillie's continued interrogation of James and stated:

> **SA Mustico:** We need to remind him that he's free to go anytime and that he knows everything is all voluntary and stuff like that, just so he knows that everything he's saying—
>
> **SA Baillie:** I know. You know that we talked about it earlier.
>
> **SA Mustico:** I know. I just need to remind him because we've been talking for so long, we don't want him to think that he's stuck here with us."
>
> **SA Baillie:** So can I get a bathroom break? Ok. Ohh yeah. You wanna bathroom break?
>
> **James:** Yeah.

*Id.* at 124-125. This is the first point in the recorded interview—almost 7 hours into questioning—that FBI agents mentioned to James that the interview was voluntary.[14]

---

[14] SA Baillie claims that when he took James to pray at 1:00 PM he advised him of the voluntariness of the interview. That alleged advisal was not captured on any audio or video recording device.

Agents escorted James to the bathroom. When agents returned James to the kitchen for further questioning, SA Baillie asked him if he wanted some water. James told him no, that he couldn't have food or water because it was the first day of Ramadan.[15] *Id.* at 125. At that point, at almost 4:00 PM, the agents realized James had not had any food or water all day. This exchange followed:

> **SA Mustico:** We just want to make sure that you know that you can leave whatever you want and you don't have to actually talk to us, but we do want to hear your story and we would like to keep talking with you.

> **SA Baillie:** Yeah. We're, we're, yeah, we're just trying to understand where you're coming from.

> **James:** Yeah. And I mean, you know, and so just like you know online, you know, for you guys, you know, I'm not going to outright lie about anything, you know these are really my beliefs.

> **SA Baillie:** So let's, let's hit that statement. . . . You're not going to outright lie, but you have. You have right? Because I heard you say until you can prove to me that I didn't do this, I'm not going to say I did. So, it's not an outright lie, so you're kind of really skirting that . . .

> **James:** [Inaudible]

> **SA Baillie:** Ok, but so what?

> **SA Mustico:** Don't worry, we can move forward.

> **SA Baillie:** Again, that's why I'm sitting here and having this discussion 'cause I don't want you to get jammed up on a thousand one. Because I'll be honest, we have enough to jam you up on one thousand one.

> **James:** Okay.

> **SA Baillie:** And enough to take you to prison for lying because you straight up lied and I can prove it, and they ask you time and time and time again. So, going forward, it's got to be the truth. It can't be these loopholes, like you're a man, you're devout in your beliefs. You have to own your life, good and bad. Right. You, you made some threats. That's not

---

[15] The first day of Ramadan in 2025 fell on February 28, 2025, the day agents executed the search warrant, and ran until March 30, 2025. Fasting is required from dawn to dusk during Ramadan.

gonna work in this country. . . . So I'm going to ask you straight up and I want a straight answer. Are you a threat to the citizens and the people who reside here in the United States?

**James:** Ummmm …. Yes.

**SA Baillie:** You are a threat to them? Okay, I appreciate your honesty, but why are you a threat to them?

**James:** Umm… I mean, I can't, I guess I can't really give you know any specific reason, but you know if, if I had to say it's, it's literally just because, you know, I'm, you know, of the view that, umm, you know, there's really, really, there's not chance that, you know, honestly, just just that you know, umm, that I would seek out, you know, I guess, peaceful cohabitation."

*Id.* at 125-127. When agents told James that the interview was voluntary, they did not get any verbal confirmation that he understood before continuing questioning. A few minutes later, James began crying again while answering more questions about his religious beliefs.[16]

SA Baillie and SA Mustico continued questioning about the "threats" the character Crazz3pain made on Roblox:

**SA Baillie:** April of 2025. You were going to martyr yourself, kill Christians that were celebrating in concert, and ignite munitions or something to that effect. I gotta believe that was a real threat."

**SA Mustico:** He, he said he was going to ignite munitions if law enforcement came to try and arrest him.

**James:** You know—

**SA Mustico:** Those are two different statements. He wanted to go to the Christian concert and then he said he would ignite the munitions if law enforcement came to arrest progressively potentially afterwards, I assume it wouldn't be during.

**SA Baillie:** So you'd go to the Christian concert?

**SA Mustico:** Well, that was two. Both things happened. He threatened to shoot people on the Christian concert. I guess with your guns and potentially—

---

[16] ZOOM0002.WAV at 2:28:23.

**SA Baillie:** So let's talk about that. Let's split that. I have to believe after sitting here talking with you, listening to you, and we verified, you know, that you have, that you were the one making these threats. Wasn't some nefarious other person. That's a real threat, isn't it? That's a plan that you were planning?

**James:** (laughs) Yeah, no. I mean it is something I stated. But no, it's not something that I would act upon.

*Id.* at 134. SA Baillie and SA Mustico asked James whether he knew how to make bombs or detonators. They asked him if he'd made any other threats ever on other platforms. SA Baillie told James, "This is confession day." *Id.* at 142. He told James he was going to search all of his electronic devices and find anything else he'd said that could be classified as a threat. *Id.* at 142.

Agents never left James alone. When SA Baillie stepped out to work on getting an arrest warrant signed, another FBI agent filled in. At least two FBI agents always sat with James.

SA Baillie returned to ask James about whether he had ever sent cryptocurrency to groups he supported. James explained that he had not and would not know how to. *Id.* at 166-170. SA Baillie questioned James about the Bitcoin statement that Roblox character Ghurabaah made saying, "This is something I need to understand. The statement you made regarding sending Bitcoin…" James responded, "Were not true." *Id.* at 170.

SA Baillie gave James a copy of the inventory receipt and a copy of the search warrant. He told him, "I know we talked to your, to your uncle about it, but it's a copy of the warrant which gave us the reason to be here. OK. So you're, obviously you're an adult. You're here, you're free to leave it, OK? What questions do you have for us?" *Id.* at 171. James asked agents what was going to happen to him. SA Baillie told him "I think that's being decided right now. If I'm being honest." *Id.* "You're a threat," SA Baillie told James, "You know and and that's, you know, your beliefs and . . . unfortunately, your beliefs don't necessarily align with US laws." *Id.* SA Baillie

told James, "You are a threat to the American people." *Id.* at 172. SA Baillie told James that they had "gotten into some dark places" over the course of the questioning and "now we're going to have to deal with that. But again, I appreciate you taking the time to, you know, because you didn't have to, right? I mean you're aware of that, right?" James's response was "Mhmm." *Id.* At 173.

Agents questioned James until 8:50 PM.[17] The interrogation lasted for 11½ hours. By 8:00 pm, James was yawning audibly before responding to questions.

At 9:00 PM, ten minutes after questioning ceased, Williamson County Sheriff's officers entered the house and placed James under arrest for terroristic threat. The arrest warrant had been signed at 8:43 PM.[18] James was wrapped up in a cocoon of a blanket on the couch.[19]



When told he was under arrest, he said "Okay, can I put on, like, shoes?"[20]

---

[17] FD-302 dated 3/25/2025, by Nicholas Mustico.
[18] FD-1057 dated 3/11/2025, Title: Burger Arrest Documentation, Drafted by: Randell Pitts.
[19] F3095734_2025-03-01T02.43.10.540Z_340.mp4 at 1:33.
[20] F3095734_2025-03-01T02.43.10.540Z_340.mp4 at 1:59.



When agents asked him for a picture ID, James said that he had none aside from his high school

ID.[21]



---

[21] F3095723_2025-03-01T02.43.10.716Z_334.mp4 at 4:04.

Williamson County officers took James to the county jail, where he remained until May 19, 2025, when he was brought into federal custody on a complaint charging him with making interstate threatening communication in violation of 18 U.S.C. § 875(c). ECF No. 1. On June 17, 2025, the government filed an indictment charging James with two counts of interstate threatening communication in violation of 18 U.S.C. § 875(c). ECF No. 19. On October 21, 2025, the government filed a superseding indictment adding a third charge for interstate threatening communication. ECF No. 40.

James has spent what should have been his last semester of high school in federal custody awaiting trial.

## II.    Legal Standard

The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself....". U.S. Const. amend. V. "To counteract the coercive pressure [of custodial interrogation], *Miranda* announced that [government] officers must warn a suspect prior to questioning that he has the right to remain silent, and a right to the presence of an attorney." *Maryland v. Shatzer*, 559 U.S. 91, 103–04 (2010).

These procedural safeguards are meant to balance the "compulsion inherent in custodial surroundings." *Miranda v. Arizona*, 384 U.S. 436, 458 (1966). An individual can waive his *Miranda* rights so long as he does so "voluntarily, knowingly, and intelligently." *Id.* 444. The prosecution has the burden of establishing a voluntary, knowing, and intelligent waiver of the *Miranda* rights. *Tague v. Louisiana*, 444 U.S. 469 (1980). This burden is a heavy one. *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).

"*Miranda* warnings must be administered prior to 'custodial interrogation.'" *United States v. Bengivenga,* 845 F.2d 593, 595 (5th Cir.1988) (quoting *Miranda*, 384 U.S. at 479). "A suspect is ... 'in custody' for *Miranda* purposes when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *Id.* at 596. "Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave." *J.D.B. v. N. Carolina,* 564 U.S. 261, 270 (2011). "The reasonable person through whom we view the situation must be neutral to the environment and to the purposes of the investigation—that is, neither guilty of criminal conduct and thus overly apprehensive nor insensitive to the seriousness of the circumstances." *Bengivenga,* 845 F.2d at 596.

A determination of whether a defendant is "in custody" for *Miranda* purposes depends on the "totality of circumstances." *California v. Beheler,* 463 U.S. 1121, 1125 (1983). In determining whether an individual is in "custody," the Court conducts an objective inquiry. *See J.D.B.*, 564 U.S. at 270. "[T]he subjective views harbored by either the interrogating officers or the person being questioned are irrelevant." *Id.* at 271 (internal quotation marks omitted). The inquiry requires the Court "to examine all of the circumstances surrounding the interrogation, including any circumstance that 'would have affected how a reasonable person' in the suspect's position 'would perceive his or her freedom to leave.'" *Id.* at 270-271 (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994)).

"Relevant factors include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." *See Howes v. Fields*, 565 U.S. 499, 509 (2010) (internal citations omitted). Because no single factor is determinative, the Fifth Circuit considers several factors in deciding whether a person is in custody for *Miranda* purposes—the length of the questioning, the location of the questioning, the accusatory or non-accusatory nature of the questioning, the amount of restraint on the individual's physical movement, and statements made by officers regarding the individual's freedom to move or leave. *United States v. Wright*, 777 F.3d 769, 775 (5th Cir. 2015).

## III.    Argument

The Court should suppress the statements James Burger made to law enforcement on February 28, 2025. Law enforcement's eleven-and-a-half hour questioning of Mr. Burger occurred in clear violation of the Fifth Amendment because FBI agents subjected him to a custodial interrogation and failed to provide him with *Miranda* warnings.

The encounter began with twenty-four FBI agents decked out in full SWAT gear carrying assault-style rifles swarming the house. They immediately handcuffed James in the driveway. James remained handcuffed as he watched other family members be led out of the house with their hands free. The interrogation began with James handcuffed in the back seat of an unmarked SUV. Though the handcuffs were removed after eighteen minutes, FBI agents led James into the dining room, sat on either side of him, and peppered him with questions while a search warrant team spent the next four hours searching and seizing items in the house. James could not drink or eat all day because it was Ramadan. When he asked to perform the obligatory midday prayer, he was told he

could pray *after* he signed a consent to search form and provided usernames and passwords to his online accounts. The questioning grew increasingly accusatory. Agents repeatedly told James he was lying, that they could "jam him up," that they had "enough to take you to prison for lying because you straight up lied," and that he needed to "be a man." Seven hours into the interrogation, agents told him the interview was voluntary. This happened at approximately 3:30 PM pm. The questioning lasted eleven-and-a-half hours. It ended at 8:50 pm. Agents formally arrested James ten minutes later.

A reasonable person in James's position would not have felt free to leave. In *United States v. Cavazos*, the Fifth Circuit affirmed suppression of a defendant's statements and a finding that the defendant was in custody for *Miranda* purposes in a factual scenario similar to this case. 668 F.3d 190, 194-95 (5th Cir. 2012). In *Cavazos*, fourteen officers entered Cavazos's home to execute a search warrant issued upon the belief that Cavazos had been texting sexually explicit material with a minor. *Id.* at 192. Agents immediately went to Cavazos's bedroom, handcuffed him, and kept him isolated in the kitchen away from family. *Id.* After securing the home, agents uncuffed Cavazos and told him they wanted to conduct a "non-custodial" interview and he was free to eat, drink, and use the bathroom. *Id.* Agents questioned Cavazos without reading him his *Miranda* rights, and Cavazos eventually made inculpatory statements. *Id.* Cavazos was allowed to use the bathroom, but an agent stood outside the door. *Id.* He was also allowed to call his brother. In total, the interrogation lasted slightly more than one hour. *Id.* While the officers in *Cavazos* told the defendant the interview was "non-custodial" at the outset, the Fifth Circuit held this was not determinative because it was not equivalent to an assurance that he could "terminate the interrogation and leave." *Id* at 195. The Fifth Circuit upheld the decision suppressing the statement

and finding that the defendant had been subjected to custodial interrogation under the totality of the circumstances. *Id.* James was subjected to an even more clearly custodial interrogation than the defendant in *Cavazos*, and agents never advised him of his *Miranda* rights.

### A. The location of the questioning supports a finding that James was in custody and not free to leave.

Here, the interrogation occurred in a police-dominated atmosphere and FBI agents severely restricted James' freedom of movement over the course of the interrogation. Both of these facts render the location of the questioning one that supports a finding that James was in custody.

### 1. James was subjected to a "police-dominated atmosphere" from the very beginning of the interaction with FBI agents.

The large number of FBI officers that swarmed the residence in full tactical gear, complete with bullet-proof vests and with assault-style rifles drawn and trained on James, rendered the interaction here coercive from the beginning. A "large number of officers" entering a home or surrounding a suspect before initiating questioning is a fact that supports a finding that a person is in custody and a reasonable person would not feel free to leave. *See Cavazos*, 668 F.3d at 194 (including the "large number of officers enter[ing] Cavazos's home, without his consent, early in the morning" in the list of factors that the court ultimately concluded rendered the interrogation custodial); *see also United States v. Craighead*, 539 F.3d 1073, 1085 (9th Cir. 2008) (suppressing statements made during in-home interrogation where home was "a police-dominated atmosphere"); *United States v. Colonna*, 511 F.3d 431, 436 (4th Cir. 2007) (finding that the defendant was interrogated in a police dominated environment where his residence was "inundated with over twenty-three FBI agents," the defendant was awakened at gun point and guarded at all

times, and the defendant was questioned by two armed agents in a vehicle outside of his house for three hours).

Here, twenty-four officers descended on James's home as he was about to get into his uncle's car to go to school. The agents were wearing bullet-proof vests and tactical headgear. They carried assault-style rifles, which they had drawn and trained on James and the front door of the house. Four agents—all with rifles drawn and their sights trained on him—immediately surrounded James, placed him in handcuffs, and put him in the back of a law enforcement vehicle. Law enforcement's immediate exercise of physical dominion over James supports a finding that James was in custody.

The number of law enforcement officers and the fact that they were heavily armed is important in considering the extent to which law enforcement dominated the atmosphere and rendered the home custodial. *See United States v. Mittel-Carey*, 493 F.3d 36, 40 (1st Cir. 2007) (finding that the presence of eight officers in the home contributed to a police-dominated environment); *United States v. Revels*, 510 F.3d 1269, 1270 (10th Cir. 2007) (seven officers from two different agencies); *Sprosty v. Buchler*, 79 F.3d 635, 638, 642 (7th Cir. 1996) (five officers, one of whom was visibly armed and in uniform, who surrounded suspect in two police cars); *Orozco v. Texas*, 394 U.S. 324, 327 (1969) (finding defendant in custody where four officers entered the suspect's bedroom and acted as though he was "not free to leave" but did not actually handcuff him).

The other residents of the home were not handcuffed. James watched his uncle and two cousins walk out of the house and move freely with FBI agents, who escorted them outside. *See Bengivenga*, 845 F.2d at 597 n. 16 ("The *awareness* of the person being questioned by an officer

that he has become the 'focal point' of the investigation, or that the police have ample cause to arrest him, may well lead him *to conclude, as a reasonable person*, that he is not free to leave, and that *he has* been significantly deprived of his freedom ...." (emphasis in original) (citation omitted)). Agents separated James from his family, handcuffed him, and placed in the back seat of a police SUV where he could see his other family members walk by him. James clearly perceived that he was the target.

Though agents removed the handcuffs after about fifteen minutes before taking James inside the home, a reasonable person would not feel free to leave during the lengthy interview just because the handcuffs had been removed. As the Fifth Circuit noted in *Cavazos*, "[w]hile the handcuffs were removed prior to interrogation, the experience of being singled out and handcuffed would color a reasonable person's perception of the situation and create a reasonable fear that the handcuffs could be reapplied at any time." 668 F.3d at 195.

Agents interrogated James first in the driveway and then moved him inside his aunt and uncle's home to continue questioning. Being inside one's "home" does not automatically equate to freedom from custody. *Miranda* "does not allow for a simple in-home vs. out-of-home dichotomic analysis." *Cavazos*, 668 F.3d at 194. "The usual inquiry into whether the suspect reasonably believed he could 'leave' the interrogation does not quite capture the uniqueness of an interrogation conducted within the suspect's home." *United States v. Craighead*, 539 F.3d 1073, 1082 (9th Cir. 2008). As the court in *Craighead* explained, the salient concern for *Miranda* purposes is whether the person is "cut off from the outside word." *Id.* (citing *Miranda*, 384 U.S. 436, 445 (1966)). The "extent to which the circumstances of the interrogation turned the otherwise

comfortable and familiar surroundings of the home into a 'police-dominated atmosphere'" is the relevant inquiry. *Id.* at 1083.

James's home was overrun with FBI agents. They brought him inside. They seated him at the dining room table. Two agents sat on either side of him. Other agents continued searching the house, entering the rooms, opening and closing doors, calling out to each other—all in James's line of sight. James was, quite literally, surrounded by agents. A suspect "may not feel that he can successfully terminate the interrogation if he knows that he cannot empty his home of his interrogators until they have completed their search." *United States v. Craighead*, 539 F.3d 1073, 1083 (9th Cir. 2008). Here, almost the entire search team stayed present on the scene for over four hours, searching around James and the three agents interrogating him.[22] Not only was James not told the interview was voluntary during those hours, but he witnessed agents all around him and all around the house during that time.

Over four hours of the audio recording contains background noises of doors opening and closing, a door slamming, agents murmuring as they pass in the background, agents interrupting questioning to ask James for passwords and pins to open electronic devices. The level of law enforcement activity surrounding him rendered the "home" custodial as "a reasonable person interrogated inside his own home may have a different understanding of whether he is truly free 'to terminate the interrogation' if his home is crawling with law enforcement agents conducting a warrant-approved search." *Craighead*, 539 F.3d at 1083; *see also United States v. Colonna*, 511 F.3d 431, 436 (4th Cir. 2007) (finding that the defendant was interrogated in a police dominated environment where his residence was "inundated with over twenty-three FBI agents"); *Sprosty v.*

---

[22] SA Baillie didn't ask James to sign the inventory form receipt until almost 3:00 PM. Transcript at p. 113.

*Buchler*, 79 F.3d 635, 641 (7th Cir. 1996) ("More important than the familiarity of the surroundings where [the defendant] was being held is the degree to which the police dominated the scene."); *United States v. Griffin*, 922 F.2d 1343, 1354-55 (8th Cir. 1990) ("Questioning which occurs in the suspect's own home may provide a margin of comfort, but . . . the setting of the interrogation is not so important to the inquiry as the question of police domination of that setting.").

### 2. FBI agents restricted James' movements and kept him isolated from his family for the duration of the questioning.

Not only was the home full of agents for at least the first four hours of questioning, but agents did not allow James to move freely in the home. He was never left alone. He was not free to get up and move around. Though agents offered him a drink—hours into the interrogation—he was not at liberty to get up and walk into the kitchen. When SA Carter asked him to scroll through his phone, SA Baillie gripped James's arm firmly. When James asked to pray after the call to prayer sounded, the agents told him to sign a consent to search form and provide all the passwords to his online accounts, "and then we'll take you to pray." Exhibit A at p. 79. Even James's ability to pray was restricted by FBI agents and made contingent on complying with their demands. When James was taken to pray, an agent stood inside the room and observed him. An agent watched him use the bathroom. The total restriction placed on James shows the custodial nature of the interrogation. *See, e.g., United States v. Mittel-Carey*, 493 F.3d 36, 40 (1st Cir. 2007) (affirming suppression of statement where, though defendant was told he did not have to respond to questioning, "the level of physical control that agents exercised over the defendant" during a one-and-a-half hour interview with the defendant being allowed to move only three times—once to

speak to his girlfriend before she left for work, once to use the bathroom accompanied by an agent, and once to feed his pet rabbits—amounted to custodial interrogation).

In *United States v. Martin*, the district court suppressed statements obtained during an in-home interrogation in facts similar to those here. Crim. Bo. RDB-17-0069, 2018 WL 6606232 (D. Md. Dec. 17, 2018). In that case, nine FBI SWAT agents accompanied by other local law enforcement went to the defendant's residence to execute a search warrant and saw him outside. *Id.* at *2. They ordered him to the ground, handcuffed him, and kept him handcuffed for thirty minutes while they secured the residence. *Id.* Agents then took him inside his home and removed his handcuffs. *Id.* Three FBI agents began to interrogate him, but at the beginning of the interview agents told him that he was not under arrest and his participation was voluntary. *Id.* at *3. Agents confronted the defendant with incriminating evidence, accused him of lying to them, and told him he was a "bad man." *Id.* The defendant was allowed to leave the interrogation space once, to assist an agent in accessing his computer equipment. *Id.* Agents kept him separated from his partner for the entire four-hour interrogation. *Id.* The defendant ultimately admitted to taking classified documents from his workplace and was charged with willful retention of national defense information. *Id.* The court held that the police dominated atmosphere before and during the interrogation, the number of officers on the scene, the length of the interview, the accusatory nature of the questioning, and keeping the defendant isolated from his partner all supported the finding that he was subjected to custodial interrogation and that a reasonable person would not have felt free to leave. *Id.* at *6-7. The court specifically noted that keeping a defendant isolated from family is "a tactic the Supreme Court has recognized as one of the distinguishing features of a custodial interrogation." *Id.* at *7 (quoting *Miranda*, 384 U.S. at 445–46); *see also United States v. Hashime*,

734 F.3d 278, 284 (4th Cir. 2013) (stating that, where the defendant was isolated from family members, "[i]t is little wonder that [the defendant] testified that, during the interrogation, 'I didn't think I had any chance to leave …'").

The show of force was overwhelming. Twenty-four FBI agents permeated every corner of the home. A three-agent team interrogated James. There was a total restriction on James's movement. James was kept isolated from his family. The custodial nature of the setting dominated any sense of security provided by the home.

**B. The length of questioning here—11.5 hours—supports a finding that James was in custody and not free to leave.**

The length of the questioning weighs heavily in favor of finding the interrogation was custodial. While there is no *per se* rule that an interrogation lasting longer than an hour constitutes custodial interrogation, the Fifth Circuit has stated that it is an "important" factor to consider. *United States v. Harrell*, 894 F.2d 120, 124 n. 1 (5th Cir. 1990). The Fifth Circuit has stated that "a detention of approximately an hour raises considerable suspicion" that the subject was in custody. *Id.* Here, James's interrogation lasted ten hours longer.

In-home questioning lasting significantly less time than the FBI interrogation of James has been found to meet the definition of custodial. In *United States v. Colonna*, the Fourth Circuit affirmed suppression of a defendant's statements after his residence was "inundated with over twenty-three FBI agents," and he was isolated from his family during the interrogation and questioned for three hours while FBI agents executed a search warrant for child pornography. 511 F.3d 431, 436 (4th Cir. 2007); *see also United States v. Cavazos*, 668 F.3d 190, 192 (5th Cir. 2012) (questioning lasted more than one hour, suppression granted); *United States v. Craighead*, 539 F.3d 1073, 1978 (9th Cir. 2008) (interview lasted twenty to thirty minutes, suppression granted);

*United States v. Wittich*, 63 F. Supp. 3d 644, 646 (E.D. La. 2014) (following a search conducted by 10-15 agents, defendant interviewed for 20 to 30 minutes, suppression granted). The length of the questioning here—with agents giving no *Miranda* warnings at any point—weighs heavily in favor of suppression.

### C. The accusatory nature of the questioning supports a finding James was in custody and a reasonable person would not have felt free to leave.

The accusatory nature of the questioning also demonstrates that the interrogation was custodial. Shortly into the interrogation, SA Carter told James that she didn't think he was being entirely truthful. Transcript at pg. 62-63. Later, at about 12:10 PM, SA Mustico told him that it is "illegal to lie to [the FBI]," and gave James an "Acknowledgement of Penalties for False Statements to the FBI" form to sign. *Id.* at 67. Later during the interview, SA Baillie grew verbally accusatory toward James, telling him that he could "jam him up" and that he had enough already to "take him to prison for lying." *Id.* at 127. Baillie also repeatedly told James that he needed to "be a man." *Id.* at 117. The nature of the questioning would lead a reasonable person to believe that he was not free to leave. *See United States v. Chavira*, 614 F.3d 127, 134 (5th Cir. 2010) (finding thirty to forty minutes of increasingly accusatory questioning would indicate to the reasonable person in [the defendant's] situation that her freedom had been restrained to the degree associated with formal arrest."); *see also United States v. Martin*, 2018 WL 6606232, at *7 (finding that "the broader setting of the Defendant's interrogation makes clear that the agents' few statements to him at the beginning of his four-hour interrogation cannot erase its custodial nature") (internal citations omitted).

### D. Statements Made by Officers

Finally, the Court must consider the agents' statements regarding the individual's freedom to move or leave. Here, this factor also weighs in favor of finding the interrogation custodial. When law enforcement first began interviewing James, the agents said nothing about his right to remain silent. *See* Exhibit A, at pgs. 2-6. To the contrary, SA Mustico told James that they were going to move him inside so that he could "be more comfortable." Agents never told James he could leave. They never told him that he did not have to answer questions. The one time James asked to move— to pray—he was told that agents would "take him" to pray. And even being "taken" to pray was contingent on first signing a consent to search form. There is no recorded evidence agents told James anything about voluntariness until 3:30 pm. *Id.* at 124-125. At that point, agents did not ask James if he wanted to continue. Rather, SA Mustico and SA Baillie talked to each other about the need to tell James "everything is all voluntary and stuff." *Id.* James just sat there.

In addition to coming five and a half hours into the interrogation, the effect of this warning was undermined by the circumstances in which it was given. The agent's statements "must be analyzed for their effect on a reasonable person's perception, and weighed against opposing facts." *Cavazos*, 668 F.3d at 195. James was told that he could leave if he wanted, but he was in his home. A reasonable person, when told he is free to leave his own home, would not understand the meaning of such an assertion. The Ninth Circuit, in finding that a defendant's home interview amounted to a custodial interrogation, reasoned that:

> "If a reasonable person is interrogated inside his own home and is told he is "free to leave," where will he go? The library? The police station? He is already in the most constitutionally protected place on earth. To be "free" to leave is a hollow right if the one place the suspect cannot go is his own home."

*United States v. Craighead*, 539 F.3d 1073, 1083 (9th Cir. 2008); *see also United States v. Wittich*, 63 F. Supp. 3d 644, 651 (E.D. La. 2014) (granting a motion to suppress a statement taken after more than a dozen federal agents in bullet proof vests executed a search warrant at a business, separated the defendant from other employees, physically transported him to the office to question him, and he lacked the transportation to leave of his own accord, even when told he was not under arrest).

The Court must consider the totality of the circumstances and the "broader setting" of the interrogation. For example, in *Martin*, agents started a four-hour interrogation by telling the defendant that he was not under arrest, that his participation was voluntary, and that he was free to leave. 2018 WL 6606232, at *7. The district court found that those statements were relevant to the analysis, but "these statements are not sufficient in and of themselves to show a lack of custody" because "[t]he 'broader setting' of the Defendant's interrogation makes clear that the agents' few statements to him at the beginning of his four-hour interrogation 'cannot erase its custodial nature.'" *Id.* (internal citations omitted).

This case is similar to *United States v. Hashime*, where the Fourth Circuit reversed a district court's denial of a motion to suppress statements made following what it determined to be an un-*Mirandized* custodial interrogation. 734 F.3d 278, 285 (4th Cir. 2013). In *Hashime*, a team of fifteen to thirty state and federal agents executed a search warrant on the home of Faisal Hashime looking for evidence of child pornography. *Id.* at 280. Hashime was a 19-year-old community college student living with his parents. *Id.* Officers entered the home with their guns drawn, took Hashime out of bed and onto the front lawn, then escorted him into the basement for questioning. *Id.* at 280–81. The interrogation lasted three hours. *Id.* At the beginning of the interview, "the

officers told Hashime that he did not have to answer their questions and could leave at any time." *Id.* at 281. At various points during the questioning, officers told Hashime they felt he was lying. *Id.* Two hours into the interrogation, officers read Hashime his *Miranda* rights, before continuing questioning him for another hour. *Id.* Officers did not arrest Hashime at the conclusion of the interview, but instead returned three days later with an arrest warrant and Hashime was indicted on seven counts of production of child pornography. *Id.* The Fourth Circuit reversed the district court's denial of the motion to suppress, finding that "[t]he broader setting makes clear why a few isolated statements by law enforcement in the course of a three-hour interrogation cannot erase its custodial nature." *Id.* at 284.

Here, unlike in *Martin, Hashime,* and *Cavazos*, agents did not provide James with any warnings about the voluntariness of his participation or his freedom to leave at the beginning of the interrogation. SA Mustico's offhand comment to SA Baillie in front of James that "we should tell him it's voluntary and stuff" was woefully insufficient to cure what was very clearly a hallmark custodial interrogation. Additionally, agents never read James his *Miranda* warnings, even at the end of the interrogation as they waited for the Williamson County Sheriff's office to arrive with an arrest warrant based entirely on information obtained from the FBI.

The heavy FBI presence and show of force, the length, location and accusatory nature of the questioning, and the total restraint on James's movement coupled with the lack of advice on the voluntariness of his participation all weigh in favor of finding James was in custody. An interrogation under these circumstances would lead a reasonable person to believe that he was not at liberty to terminate the interrogation. Because the interrogation was custodial and agents failed

to provide *Miranda* warnings, James's statement was obtained in violation of the Fifth Amendment and must be suppressed.

## IV.    Conclusion

For all these reasons, the Court should find that James Burger was in custody for purposes of *Miranda* and the FBI agents' failure to read him his *Miranda* rights makes his statements inadmissible, as they were obtained in violation of the Fifth Amendment and *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Should the Court determine that factual disputes surrounding the circumstances of the statements exist, Mr. Burger requests an evidentiary hearing on this motion to resolve any factual disputes.[23]

Respectfully submitted,

MAUREEN SCOTT FRANCO
Federal Public Defender

_____
/s/ JOSE I. GONZALEZ-FALLA
Assistant Federal Public Defender
Western District of Texas
Lavaca Plaza
504 Lavaca St., Ste. 960
Austin, Texas 78701
(512) 916-5025
(512) 916-5035 (FAX)
Bar Number: Texas 08135700

---

[23] Should the Court determine that an evidentiary hearing is appropriate, Mr. Burger requests, pursuant to Rule 26.2 of the Federal Rules of Criminal Procedure, that the Government disclose to defense counsel at least forty-eight hours prior to the hearing any statements, including grand jury testimony, of suppression hearing witnesses. Mr. Burger further requests that the government disclose any *Brady* or *Giglio* materials within this time frame to avoid any delays in conducting the hearing. Mr. Burger expressly reserves the right to raise any other motions based on facts and evidence that may arise during any evidentiary hearings in this case. As the government is still producing discovery to counsel, Mr. Burger reserves his right to file additional pretrial motions as additional discovery may necessitate.

/s/ CHARLOTTE A. HERRING
Assistant Federal Public Defender
Western District of Texas
Lavaca Plaza
504 Lavaca St., Ste. 960
Austin, Texas 78701
(512) 916-5025
(512) 916-5035 (FAX)
TX Bar Number: 24064026

*Attorneys for Defendant*

# CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of November 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Mark Roomberg
Keith Henneke
United States Attorney's Office
903 San Jacinto Blvd., Suite 334
Austin, TX 78701

/s/ CHARLOTTE A. HERRING

37

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **V.** | § | **NO.    A-25-CR-00332 (ADA)** |
| | § | |
| **JAMES WESLEY BURGER** | § | |

**EXHIBIT LIST**

**Exhibit A** – Updated Transcript of James Burger Interview, February 28, 2025 (prepared by government)

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **V.** | § | **NO.    A-25-CR-00332 (ADA)** |
| | § | |
| **JAMES WESLEY BURGER** | § | |

**O R D E R**

On this date, the Court considered Defendant's Motion to Suppress Statements.  The Court, having considered the motion, is of the opinion that the motion should be granted.

IT IS THEREFORE **ORDERED** THAT the Defendant's Motion to Suppress Statements is hereby **GRANTED.**  Defendant's statements made on February 28, 2025, to law enforcement agents are HEREBY SUPPRESSED.

SIGNED this _____ day of _____, 2025.


_____
ALAN D. ALBRIGHT
UNITED STATES DISTRICT JUDGE