**FILED**

March 19, 2026
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _Christian Rodriguez_
DEPUTY

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 19, 2026

Lyle W. Cayce
Clerk

———————————

No. 25-50976
CONSOLIDATED WITH
Nos. 25-51021 and 26-50011

———————————

UNITED STATES OF AMERICA,

*Plaintiff—Appellant*,

*versus*

JAMES WESLEY BURGER,

*Defendant—Appellee*.

———————————————————————

Appeals from the United States District Court
for the Western District of Texas
USDC No. 1:25-CR-332-1

———————————————————————

Before ELROD, *Chief Judge*, and SMITH and WILSON, *Circuit Judges*.

PER CURIAM:

A grand jury charged James Wesley Burger with three counts of transmitting threats in interstate commerce. The district court dismissed the indictment, concluding that no reasonable juror could find beyond a reasonable doubt that Burger's statements were "true threats" and thus outside the protection of the First Amendment. Because a trial on the merits

25-50976
c/w Nos. 25-51021 and 26-50011

is necessary to evaluate the sufficiency of the government's evidence, we reverse the district court's order dismissing the indictment and remand.

I

We first discuss the factual background of this case and then turn to its procedural history.[1]

A

The alleged threats in this case took place on Roblox, a popular online gaming platform and game-creation system. Roblox is not a single game. It is a platform that hosts millions of user-created "experiences," which include games, virtual worlds, and social spaces. Anyone can build experiences on Roblox using its free development tool. Once built, experiences can be joined by other users.

Some experiences involve strategy and contain tasks or goals. For example, in an experience called "Grow a Garden," players buy seeds, grow plants, sell the plants, and, with the money, buy more seeds. Other experiences have less of an objective but give users the opportunity to role-play and be creative. For example, the "Courtroom Shenanigans" experience is a courtroom simulator where each user is assigned a role: prosecutor, defendant, witness, bailiff, attorney, or jury member. A case is presented in which the defendant is accused of something absurd, witnesses testify, and attorneys present argument. The jury deliberates and votes on whether the defendant is guilty or not guilty. Still other experiences involve more earnest communication. In the "Up For Debate" experience, for

_____

[1] The following recitation of facts assumes the truth of the allegations in the indictment and reflects the evidence in the light most favorable to the government. *See United States v. Kay*, 359 F.3d 738, 742 (5th Cir. 2004).

25-50976
c/w Nos. 25-51021 and 26-50011

example, two players are randomly assigned a topic and argue for or against a proposal.

Roblox experiences share some fundamental features. First, each user customizes an avatar. In Roblox, an avatar is a humanoid figure with a cylindrical head, C-shaped hands, a block-shaped body, and a cartoon-like facial expression. Users choose their avatars' clothing, body parts, facial expressions, gear, and accessories. Typically, when a user joins an experience, his Roblox avatar spawns into the world, though developers can override the user's avatar with a custom character, force a custom style, hide the avatar completely, or lock the camera to a fixed perspective.

Second, the chat function. Experiences can enable either text chat or voice chat for users. When a player types a message, that message appears in a chat window, in a speech bubble above the avatar's head, or both. The chat bubbles disappear after being visible to nearby players for a few seconds.

Users can join a Roblox experience on a computer, mobile device, or console such as an Xbox or PlayStation. The cross-platform availability allows players on different devices to join the same experiences. Partly because of this, Roblox has a massive user base: Roblox reports 144 million daily active users. Only 27% of Roblox users are 18 or older.[2]

B

The statements at issue in this case took place in an experience called "Church." The Church experience was created in September 2017 and had logged 20 million visits by the time of Burger's arrest in February 2025. Avatars entered a structure styled as a virtual church through a set of doors.

---

[2] Roblox Corp., Q4 2025 Shareholder Letter 1–3 (Feb. 5, 2026), https://s27.q4cdn.com/984876518/files/doc_financials/2025/q4/Q4-2025-Shareholder-Letter.pdf.

Inside appeared rows of pews and a pulpit with a large cross on a wall facing the entrance. In the church, avatars walked around and argued with each other. This experience was not task-oriented; rather, avatars explored the 3-D church and communicated with other users.

A user in the Church experience could use "Robux"—the game's virtual currency and the method by which developers monetize their creations—to customize his avatar's outfit and appearance. Users customized their avatars' appearances to align with their positions— sometimes extreme or offensive. Avatars in the Church experience included skinheads arguing about race, balaclava-clad members of the Irish Republican Army, Nazi S.S. officers denying the Holocaust, and avatars dressed in Middle Eastern clothing debating the Koran and discussing violent jihadism. It is unclear at this stage whether the typical Church player sincerely held the views which he espoused in the experience.

## C

In January 2025, James Wesley Burger was an 18-year-old high school senior living in Round Rock, Texas, and a user of the Church experience. A grand jury indicted Burger on three counts of transmitting threats in interstate commerce. The charges were based on three statements that he allegedly made in the Church experience during the month of January 2025. *First*, on January 21, 2025, Burger, using an avatar that he named "Ghurabaah," stated:

> Yes I have guns
> Incase the authorities
> Want to arrest me

When another avatar asked, "[W]hat are you g[o]nna do if they try?" Burger responded:

> I am ready

4

25-50976
c/w Nos. 25-51021 and 26-50011

To sacrifice my life
For my Rabb[3]
Detonate what I've prepared
Of munitions
And use my firearms
To take many with me
Yes wish me luck
On the path of martyrdom
In'shaa'allah[4]

A Roblox user in Pennsylvania saw these statements, captured screenshots of them, and reported them to the FBI.  According to the government, this Roblox player was an experienced participant and had the ability to differentiate between role-playing and serious expressions within the Church experience.  The government has represented that this tipster would be available to testify at trial.  This tipster was not a source for the FBI when he reported the threat, but he has since become a source for the FBI.  The record does not contain the age of this tipster.

*Second*, two days after the first alleged threat, Burger used a different avatar named "crazz3pain" to enter the Church experience.  Burger appeared alongside "xandersrange" (whom the government identifies as an ISIS supporter in Saudi Arabia) and "KardalAlli" (whom the government identifies as a Bosnian ISIS recruiter).  The government has not pointed to evidence showing that Burger knew who these avatars were outside the game or where they lived.  A Roblox user in Nevada reported to the FBI that "crazz3pain" spoke about his desire to commit "martyrdom" at a Christian

---

[3] "Rabb" is an Arabic word referring to God as Lord.

[4] "Inshallah" is an Arabic expression meaning "if Allah wills" or "God willing." Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/inshallah (last visited Mar. 19, 2026).

25-50976
c/w Nos. 25-51021 and 26-50011

event and that he wanted to "bring humiliation to worshippers of the cross." When the witness asked "crazz3pain" if it was going to be at a church service, "crazz3pain" told the witness that it would be a Christian concert. "Xandersrange" then asked how many days until "you do tha[t]," and Burger responded:

> It will be months
> Shawwal
> April
> It will be a glorious wound
> Upon their capitol
> And deal a grievous wound upon the followers of the Cross

"Xandersrange" responded, "Akhi [brother], we will make dua [an appeal or invocation] for u once u martyr," "I[']ll keep u in my prayers," and "InshaAllah [I']ll follow after u." Burger replied:

> I cannot confirm anything aloud at the moment
> But things are in motion

"Xandersrange" then turned to "KardalAlli" and said, "ALI MY BROTHER IS ABOUT TO DO HIS ATTACK," and Burger responded, "Don't delay yourselves too long brothers, Jannah [heaven] awaits us."

According to the government, the Nevada Roblox user witnessed this exchange and believed it to be a threat as opposed to trolling[5] or role-playing. That witness reported these statements to the FBI, some of which were captured in screenshots. The government has represented that this tipster would be available to testify at trial. At the time that this witness reported

---

[5] In this context, to engage in "trolling" means "to antagonize (others) online by deliberately posting inflammatory, irrelevant, or offensive comments or other disruptive content." *Troll*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/troll (last visited Mar. 19, 2026).

25-50976
c/w Nos. 25-51021 and 26-50011

Burger's statements, the tipster was, like Burger, a senior in high school. The record does not reflect whether this tipster was a minor at the time.

*Third*, a few days later, a keylogger that Burger's uncle installed on the computer that Burger used reported that Burger typed the following in the Roblox application:

> I've come to conclude it will befall the 12 of Shawwal
> And it will be a music festival
> Attracting bounties of Christians
> In'shaa'allah we will attain martyrdom
> And deal a grievous wound upon the followers of the Cross
> Pray for me and enjoin yourself to martyrdom

The keylogger program captured only what was typed by Burger—not other avatars. The record does not reflect what other avatars were with Burger, the reaction, if any, to Burger's statement, or the statements, if any, to which Burger was reacting.

According to the government, "the 12 of Shawwal" means April 12, 2025. The government also contends that a Christian concert was scheduled for April 12, 2025, in Austin.[6] An examination of Burger's devices revealed a number of disturbing internet searches, including, "Lone wolf terrorists isis," "Which month is april in islam," "Festivals happening near me," and "what is the punishment for the one who insults allah or his messenger."

Burger made some concerning statements during the 11 hours that FBI agents spent at Burger's house executing a search warrant. Burger moved to suppress these statements under *Miranda v. Arizona*, 384 U.S. 436 (1966). The government did not oppose the motion, so all parties agree that the statements cannot be used in the government's case in chief. No party

---

[6] The government has not identified the performer at this concert or the venue at which the concert occurred.

7

25-50976
c/w Nos. 25-51021 and 26-50011

has asserted that these statements are material to Burger's motion to dismiss, so we do not discuss them further.

D

A federal grand jury initially indicted Burger on two counts of violating 18 U.S.C. § 875(c).[7]  Upon the indictment, the government sought pretrial detention, urging that Burger constituted a flight risk and a danger to the community.  A magistrate judge held a contested detention hearing and, after agreeing with the government that Burger was a flight risk and danger to the community, ordered Burger detained pending trial.  A superseding indictment added a third count under § 875(c).

Burger moved to dismiss the indictment under Federal Rule of Criminal Procedure 12, arguing, among other things, that the indictment punished speech protected by the First Amendment.  A week before the trial setting, the district court orally granted Burger's motion to dismiss and ordered him released.  The district court denied the government's motion to stay the dismissal.  Two days later, the district court issued a written dismissal order stating that a memorandum in support of the written order would be forthcoming.  The government filed its first notice of appeal that same day, and Burger was released without conditions.

The government filed an emergency motion with this court to stay the district court's dismissal and release orders.  A motions panel administratively stayed the orders for ten days to allow the district court to provide its reasons for dismissal and produce hearing transcripts.  The stay

---

[7] "Whoever transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both."  18 U.S.C. § 875(c).

8

25-50976
c/w Nos. 25-51021 and 26-50011

did "not affect any relief that the district court may provide pursuant to 18 U.S.C. § 3143."[8]

The government then moved for a hearing in the district court on detention or conditions of release. Burger moved for release on personal recognizance without a hearing. The district court granted Burger's motion, maintaining the *status quo* of his release without conditions. The district court found that Burger "pose[d] no flight or safety risk." Via a second notice of appeal, the government appealed that order, which the parties call the "second release order." *See* Fed. R. App. P. 9(a) (providing procedures for appealing release orders prior to conviction).

Two weeks after dismissing the indictment, the district court issued a written order stating its "essential findings" pursuant to Federal Rule of Criminal Procedure 12(d). The court explained that Burger made his statements "while playing an *online video game*, speaking as a *character*, among other *players* who were similarly acting as *characters* in a virtual Church." The district court found that the statements lacked specificity and were made in a "role-playing context" where individuals "engaged in role-play," including "trolling" and "intentionally engag[ed] in distasteful debate." The district court rejected evidence of Burger's conduct outside of Roblox as "irrelevant" because it was "unknown to any recipient of the alleged threatening communications."

---

[8] Title 18 U.S.C. § 3143(c) provides that "[t]he judicial officer shall treat a defendant in a case in which an appeal has been taken by the United States under section 3731 of this title, in accordance with section 3142 of this title, unless the defendant is otherwise subject to a release or detention order." Section 3142 establishes the framework for determining whether "a person charged with an offense" should be detained or released, and if released, upon what conditions. *See* 18 U.S.C. § 3142(a). Courts look to § 3142 when determining whether a defendant should be released pre-trial.

25-50976
c/w Nos. 25-51021 and 26-50011

A motions panel administratively stayed the second release order and expedited the case to this merits panel.  The next day, we clarified that "nothing prohibits the government, in its discretion, from detaining the defendant or from requesting that the district court impose conditions of release pursuant to 18 U.S.C. § 3143."  In other words, we clarified that the parties could continue to litigate the issue of detention in district court.

To secure Burger's detention, the government sought a warrant for Burger's arrest in district court.  Burger, in turn, moved to vacate or modify the magistrate judge's original detention order, which the parties agreed was the operative order, given that we had stayed the district court's order dismissing the indictment and its "first" and "second" release orders.  A different magistrate judge scheduled a hearing on the government's motion for an arrest warrant and Burger's motion to revoke the detention order.

At the hearing on December 29, 2025—which the district judge conducted—the district court issued its "third release order," ordering Burger released with strict conditions, including home detention, GPS monitoring, a prohibition on firearm access, and a requirement to attend counseling.[9]  The government did not file a notice of appeal of the third release order.

## II

The government argues that the district court erred in dismissing the superseding indictment because whether Burger's statements were "true threats" could not properly be resolved pretrial under Rule 12.  The

---

[9] At that hearing, the government argued that the district court lacked jurisdiction to issue a new release order because the government had appealed the prior release order. The district court rejected that argument as do we.

10

government asserts that the district court improperly resolved disputed questions of fact and did so on an incomplete record. We agree.

A

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. But "[f]rom 1791 to the present," the First Amendment has "permitted restrictions upon the content of speech in a few limited areas." *United States v. Stevens*, 559 U.S. 460, 468 (2010) (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382–83 (1992)). One such category of unprotected speech is "true threats." *Virginia v. Black*, 538 U.S. 343, 359 (2003). "True threats" are "those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Id.*

A statement is a "true threat" when: (1) "an objectively reasonable person would interpret the speech as a serious expression of an intent to cause a present or future harm"; and (2) "the speaker was subjectively aware of [the statement's] threatening nature." *United States v. Jubert*, 139 F.4th 484, 490–91 (5th Cir. 2025) (quoting *Porter v. Ascension Par. Sch. Bd.*, 393 F.3d 608, 616 (5th Cir. 2004)). "The speaker need not actually intend to carry out the threat." *Black*, 538 U.S. at 359–60. Rather, "a prohibition on true threats 'protect[s] individuals from the fear of violence' and 'from the disruption that fear engenders,'" in addition to "protecting people 'from the possibility that the threatened violence will occur.'" *Id.* at 360 (quoting *R.A.V.*, 505 U.S. at 388).

The "true threats" category of unprotected speech (or at least its nomenclature) originated in *Watts v. United States*, 394 U.S. 705 (1969). There, a young Vietnam War protestor stated to a small crowd, "If they ever make me carry a rifle the first man I want to get in my sights is L.B.J." *Id.* at

11

706. The Supreme Court held that the context demonstrated that the statement was "political hyperbole"—in other words, a "very crude offensive method of stating a political opposition to the President." *Id.* at 708. The statement was made "during a political debate," was "expressly made conditional upon an event—induction into the Armed Forces—which [Watts] vowed would never occur," and "both [Watts] and the crowd laughed after the statement was made." *Id.* at 707.

So, to be a "true threat," the statement, "when taken in context," must convey a real possibility that violence will follow. *Counterman*, 600 U.S. at 74. This distinguishes a "true threat" from jests or hyperbole. *Id.* Further, the speaker must be "aware 'that others could regard his statements as' threatening violence and 'deliver[] them anyway.'" *Id.* at 79 (quoting *Elonis v. United States*, 575 U.S. 723, 746 (2015) (Alito, J., concurring in part and dissenting in part)). In short, when it comes to the true-threats analysis, "context is critical." *Bailey v. Iles*, 87 F.4th 275, 285 (5th Cir. 2023). For example, a statement in a play or a movie might reasonably be viewed differently from the same statement left in a voicemail by a masked number. *See Black*, 538 U.S. at 366. Another part of this context is how particularly the alleged threat identifies a time, place, and target. But a threat's lack of particularity is relevant only insofar as it tends to negate an assertion that an objectively reasonable listener would conclude that threatened violence will occur. *See United States v. Perez*, 43 F.4th 437, 443–44 (5th Cir. 2022).

B

Federal Rule of Criminal Procedure 12 governs pre-trial motions in a criminal case. Rule 12(b)(1) provides that a party may raise by pre-trial motion any defense that "the court can determine without a trial on the merits." A defense is "capable of determination" without a trial on the merits "if trial of the facts surrounding the commission of the alleged offense

12

would be of no assistance in determining the validity of the defense." *United States v. Covington*, 395 U.S. 57, 60 (1969).[10]   So, in this circuit, "[t]he propriety of granting a motion to dismiss an indictment under [Rule] 12 by pretrial motion is by-and-large contingent upon whether the infirmity in the prosecution is essentially one of law or involves determinations of fact." *United States v. Flores*, 404 F.3d 320, 324 (5th Cir. 2005).   And a court may not grant a motion to dismiss "on the ground that the allegations are not supported by adequate evidence, for an indictment returned by a legally constituted and unbiased grand jury, if valid on its face, is enough to call for trial of the charge on the merits." *United States v. Mann*, 517 F.2d 259, 267 (5th Cir. 1975) (citing *Costello v. United States*, 350 U.S. 359, 363 (1956)).

## C

A trial on the merits is necessary to determine whether Burger's statements were true threats.   Whether a statement is a true threat is generally a question for the jury. *See United States v. Daughenbaugh*, 49 F.3d 171, 173 (5th Cir. 1995) ("Guided by instructions . . . removing protected speech from the definition of 'threat,' the jury is to determine the nature of the subject communication.") (footnote omitted) (citing *United States v. Malik*, 16 F.3d 45 (2d Cir. 1994)).   In other words, whether Burger's statements are true threats is a fact issue. And "[t]here is no authority under Rule 12 . . . to dismiss on the basis of a sufficiency-of-the evidence defense

---

[10] The relevant provision of Rule 12 remains substantially unchanged since *Covington*.   *Compare* Fed. R. Crim. P. 12(b)(1) (1944) ("Any defense or objection which is capable of determination without the trial of the general issue may be raised before trial by motion."), *with* Fed. R. Crim. P. 12(b)(1) (2025) ("A party may raise by pretrial motion any defense, objection, or request that a court can determine without a trial on the merits.").   "No change in meaning" was intended by substituting the "more modern phrase 'trial on the merits'" for the "more archaic phrase 'trial of the general issue.'" Fed. R. Crim. P. 12, adv. comm. note (2014).

13

which raises factual questions embraced in the general issue." *Mann*, 517 F.2d at 267.

1

Only two cases from the Supreme Court, both over 50 years old, delineate the outer bounds of Rule 12. In *Covington*, the Supreme Court addressed whether a defense of self-incrimination to a Marihuana Tax Act prosecution could be properly resolved on a Rule 12 motion. 395 U.S. at 60. The Court noted that a defense is "capable of determination without the trial of the general issue" if "trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense." *Id.* The Court held that the "question whether the defendant faced a substantial risk of incrimination is usually one of law which may be resolved *without reference to the circumstances of the alleged offense.*" *Id.* (emphasis added). By contrast, more fact-bound questions like "waiver" of are more frequently "suitable for trial together with the 'general issue.'" *Id.*

In *United States v. Knox*, the defendant was indicted for "knowingly and willfully understat[ing] the number of employees accepting wagers on his behalf." 396 U.S. 77, 78 (1969). The defendant argued that, had he filed a truthful report, he would have incriminated himself under Texas wagering laws, but that if he had failed to file a report at all, he would have subjected himself to federal criminal prosecution. *Id.* at 81. He contended that a third alternative, submission of a fraudulent form, was the "least of three evils" and that he pursued that option "under a form of duress that allegedly [made] his choice involuntary for purposes of the Fifth Amendment." *Id.* The Court held that "the question whether Knox's predicament contains the seeds of a 'duress' defense, or perhaps whether his false statement was not made 'willfully,'" was "one that must be determined initially at his trial," rather than on a Rule 12 motion to dismiss. *Id.* at 83. "[E]videntiary questions of

14

this type," the Court reasoned, "should not be determined on such a motion." *Id.* at 83 n.7.

Precedent on the propriety of Rule 12 motions is sparse in our circuit as well. In *Flores*, we addressed whether 18 U.S.C. § 922(g)(5)'s prohibition of those "illegally or unlawfully in the United States" from owning guns included aliens who "entered the country illegally and subsequently qualified for temporary treatment benefits under 8 U.S.C. § 1254a." 404 F.3d at 326. Because all questions of fact were undisputed, that case was properly decided at the motion-to-dismiss stage. *See id.* at 324–25 & n.5 (noting that the "sole question" in the case was a "legal question of statutory interpretation" and that the essential facts were "uncontested").

*Mann* is also instructive. There, the defendant was charged with "knowingly and willfully" misapplying funds of the bank that he ran "with intent to injure and defraud." 517 F.2d at 262. At the hearing on the motion to dismiss, the defendant introduced evidence, much of which came from the government's files. *Id.* at 265. That evidence, the defendant contended, showed that he did not act "willfully" because it showed that he did not have knowledge that the transaction at issue was prohibited by law. *Id.* at 267. But we held that the district court erred when it considered the evidence because courts have no authority "to dismiss on the basis of a sufficiency-of-the-evidence defense which raises factual questions embraced in the general issue." *Id.* (quoting *Brown*, 481 F.2d at 1041). We also noted that the Supreme Court has "specifically held, in reversing a district court's dismissal of an indictment, that willfullness is an 'evidentiary question' that should not be determined in a Rule 12(b) proceeding." *Id.* (citing *Knox*, 396 U.S. at 83 n.7).

15

25-50976
c/w Nos. 25-51021 and 26-50011

2

Here, there are disputed facts bearing on whether Burger's statements were true threats—that is, whether Burger "consciously disregarded a substantial risk that his communications would be viewed as threatening violence," *Counterman*, 600 U.S. at 69, and "an objectively reasonable person would interpret the speech as a serious expression of an intent to cause a present or future harm," *Jubert*, 139 F.4th at 490 (quoting *Porter*, 393 F.3d at 616).

In its opinion, the district court resolved contested factual issues in concluding that no rational juror could find that Burger was subjectively aware of the threatening nature of his communications. In *Mann*, we expressly disapproved of a district court's considering evidence tending to rebut an allegation of willfulness, a subjective mental state, at the motion-to-dismiss stage. 517 F.2d at 266–67. That was so even though much of the documentary evidence came from the government's files. *Id.* at 265.

The district judge similarly erred by resolving contested factual issues in the objective inquiry. The district judge held that there was "no showing that Mr. Burger recklessly disregarded the risk that other online characters, *also playing a game*, would see his fictional character's statements and understand them to be a true threat." But, according to the government, another Roblox user *did* see the statements underlying Count One[11] and reported the threat to the FBI. A second Roblox user witnessed the statements underlying Count Three,[12] believed them to be true threats, and

_____

[11] "It will be months / Shawwal / April / It will be a glorious wound / Upon their capitol / And deal a grievous wound upon the followers of the Cross"

[12] "I have guns / Incase the authorities want to arrest me / I am ready / To sacrifice my life for my Rabb / Detonate what I've prepared / Of munitions / And use my firearms / To take many with me / Yes wish me luck / On the path of martyrdom / In'shaa'allah."

16

reported them to the FBI. Given the similar tenor of the statement in Count Two,[13] the users' understanding of the seriousness of Burger's statements could be similarly probative for that count. The reactions of the recipients of a threat can be useful in determining whether an objectively reasonable person would interpret a statement as a threat. *See Daughenbaugh*, 49 F.3d at 173–74 (noting the relevance of a victim's "extra security measures" in the wake of a threat).

This analysis also aligns with important persuasive authority: the Tenth Circuit's opinion in *United States v. Pope*, 613 F.3d 1255 (10th Cir. 2010), which other circuits have endorsed as well.[14] That opinion, authored by then-Judge Gorsuch, explained that "[t]o warrant dismissal, it must be clear from the parties' *agreed* representations about the facts surrounding the commission of the alleged offense that a trial of the general issue would serve no purpose." *Id.* at 1261 (emphasis in original). Even "*latent* factual disputes over circumstances surrounding the commission of the alleged offense can sometimes prevent pretrial determination of a defense." *Id.* (emphasis in original) (citing *United States v. Reed*, 114 F.3d 1067, 1070 (10th Cir. 1997)).

Here, the district court's findings resolved a disputed factual question: whether the context of the Church experience would lead a reasonable player to believe that Burger was role-playing rather than expressing a sincere intent to commit violence. Given that the district court's dismissal of each count depended on the "role-playing context" of

---

[13] "I've come to conclude it will befall the 12 of Shawwal / And it will be a music festival / Attracting bounties of Christians / In'shaa'allah we will attain martyrdom / And deal a grievous wound upon the followers of the Cross / Pray for me and enjoin yourself to martyrdom"

[14] *See, e.g.*, *United States v. Sampson*, 898 F.3d 270, 282–84 (2d Cir. 2018); *United States v. Grubb*, 135 F.4th 604, 607 (8th Cir. 2025). Burger neither cites *Pope* nor explains why we should not follow its reasoning.

the Church experience, the testimony from the tipsters would at the very least "provide a more certain framework for [the district court's] analysis." *Pope*, 613 F.3d at 1259 (internal quotation marks omitted).

*United States v. O'Dwyer*, 443 F. App'x 18 (5th Cir. 2011), an unpublished and non-binding decision, is not to the contrary. There, a bankruptcy debtor e-mailed his bankruptcy judge imploring him to authorize payment for the debtor's anti-depressant medication from his Social Security check. *Id.* at 19. He stated:

> Maybe my creditors would benefit from my suicide, but suppose I become "homicidal"? Given the recent "security breach" at 500 Poydras Street [the Eastern District of Louisiana courthouse], a number of scoundrels might be at risk if I DO become homicidal. Please ask His Honor to consider allowing me to refill my prescription at Walgreen's, and allowing me to pay them, which is a condition for my obtaining a refill. Please communicate this missive to creditors and their counsel. Thank you.

*Id.* at 19–20. We affirmed the district court's dismissal of the indictment. However, *O'Dwyer* does not contain any reference to testimony that would shed light on the context of these communications, and such context appears to have been agreed. *See id.* at 20 (noting O'Dwyer's "documented history of using coarse and hyperbolic language").

Here, the correct characterization of the context is disputed. While the parties to this case agree Burger made his statements in the Church experience, they disagree as to how that context affects the "true threats" analysis—and that analysis would be materially incomplete without further evidence, particularly the testimony of the two tipsters. *See United States v. Rodriguez-Rivera*, 918 F.3d 32, 35 (1st Cir. 2019) (noting that "[n]o circuit" allows dismissal under Rule 12 "on an incomplete or disputed factual record").

25-50976
c/w Nos. 25-51021 and 26-50011

Burger's argument that a trial on the merits was unnecessary boils down to his assertions that "[n]either the statements themselves nor their context were disputed" and that "[t]here is no dispute about what Roblox is." We disagree that the context is undisputed and hold that a trial on the merits is necessary to evaluate whether a reasonable jury could find that Burger's statements were true threats. Indeed, speaking on Roblox, or similar platform, does not categorically immunize someone from the criminal code. Accordingly, we REVERSE the district court's order dismissing the indictment and REMAND for further proceedings.

## III

The government separately appealed the district court's December 14, 2025 order, which provided that Burger was to be released pending his trial without conditions. But on December 29, 2025, the district court conducted a bond hearing and issued an order that imposed conditions of release on Burger, including home detention, GPS monitoring, a prohibition on firearm access, and a requirement to attend counseling. So "it is impossible for [us] to grant any effectual relief" as it pertains to the December 14 order. *United States v. Heredia-Holguin*, 823 F.3d 337, 340 (5th Cir. 2016) (en banc). Accordingly, we DISMISS that appeal as moot.[15]

## IV

The government has requested that this case be reassigned to a different district judge on remand. We decline to exercise our "extraordinary" and "rarely invoked" power to reassign. *United States v. Khan*, 997 F.3d 242, 248 (5th Cir. 2021) (quoting *Miller v. Sam Houston State Univ.*, 986 F.3d 880, 892 (5th Cir 2021)). We address each exchange that the

---

[15] The government did not appeal the December 29 order setting conditions of release.

19

government points to. As in the "true threats" analysis above, "context is critical." *See supra* at 12. So we reprint the full exchanges of which the government complains.

## A

*First*, at the hearing on Burger's motion to dismiss, the district judge noted that "if [he] were on the jury, [he] would acquit [Burger]," and "[i]f [the district judge] were a finder of fact, [he] would acquit [Burger]."

> THE COURT: Assuming that the statute is constitutional, I'm not sure why it would be me at this procedural juncture who would -- the First Amendment applies to the statute. I'm not sure how it applies -- I'm not sure I'm to make the decision right now with regard to whether or not these particular statements are sufficiently protected under the First Amendment. That's all that's troubling me right now is --
>
> [DEFENSE COUNSEL]: Okay.
>
> THE COURT: I'm very sympathetic to everything that you've said. I'll tell you if I were -- I mean, if we go to trial, the jury would never know this, but if I were on the jury, I would acquit him. So that's -- my question is whether or not that's my job -- that's something I do now and say it's the First Amendment or do I let it go to the jury and they're the arbiters of whether or not it's a real threat. Rule 29 maybe, but that's -- and, look. I'm not -- I've done this a long time and I can't get fired. So I'm not afraid to -- you know, to rule either way. I want to get -- I want to do this the right procedural way. And so give me whatever you can -- whatever comfort you can before the government argues because they're not going to pop up and say, oh, well, you -- he didn't tell you that, you know, your defendant said this and that, you know. I mean, I've read everything -- I know everything he said. And knowing everything he said, like I said, were I -- if I -- were I a finder of fact, I would acquit him. I'm struggling with whether or not I

25-50976
c/w Nos. 25-51021 and 26-50011

should dismiss the case under First Amendment as you are asking me to do now.

*Second*, at the same motion-to-dismiss hearing, the district judge made a comment about "selective prosecution":

> THE COURT:  [T]he other thing that seems to buttress you -- and I want to hear from the government -- is that this wasn't someone -- he wasn't someone who was on a campus making comments that were not directly targeting someone but maybe were related to a group or something which we've seen recently.  This was on a game site where what was being said was within the context of what people -- a lot of people are saying on the game site.  That -- it's a little -- again, I'm a little worried -- wondering how the government found him. Given the cesspool, my sense is that this website is -- and I'm -- you know, I think you could probably have an argument too about selective prosecution about -- of him when my guess is with a little elbow grease, they could find a dozen people who said equally vile things.

*Third*, at the December 29 hearing regarding Burger's conditions of release pending appeal, the district judge expressed frustration that, were this court to reverse and remand, there would be an "impossible trial" if Burger were to testify in his own defense due to the statements suppressed under *Miranda*. *See supra* at 8.[16]  At the hearing, to support its position that Burger was a danger to the community, the government moved to introduce portions of Burger's interrogation that the district court had suppressed after the

---

[16] Defense counsel represented at a prior hearing that Burger will not testify in his defense.  Of course, Burger has the right to change his mind.  *See, e.g.*, *Brooks v. Tennessee*, 406 U.S. 605, 610–11 (1972).  And the right to testify belongs to Burger himself—his "lawyer cannot waive it over his objection."  *United States v. Mullins*, 315 F.3d 449, 454 (5th Cir. 2002).

21

25-50976
c/w Nos. 25-51021 and 26-50011

government elected to not oppose Burger's motion to suppress under *Miranda*:

> [PROSECUTOR]: Exhibit 27, your Honor, Exhibit 27 through 33 are clips of the defendant's interview. I'm not sure if the we're moving --
>
> THE COURT: The interview that doesn't exist?
>
> [PROSECUTOR]: Well, the interview, your Honor, I would respectfully disagree. The interview exists.
>
> THE COURT: The interview you didn't even fight me suppressing?
>
> [PROSECUTOR]: Your Honor, we would say it still goes to the defendant's --
>
> THE COURT: The interview where you violated his constitutional rights so much so that you didn't even fight the motion to suppress?
>
> [PROSECUTOR]: Your Honor, we believe it was a voluntary interview. We did not give --
>
> THE COURT: You didn't even respond to the motion to suppress.
>
> [PROSECUTOR]: Your Honor, we did respond to the motion to suppress.[17]
>
> THE COURT: You didn't -- we can go semantically here. When I had a hearing on it, you didn't fight -- I'm not going to -- I'm not going to -- you are making the record for why I think this would be such an impossible trial is you have information

---

[17] In response to Burger's motion to suppress, the government filed a notice that it would not use Burger's statements in its case in chief, thus mooting the motion to suppress. The government reserved the right use the statements as impeachment evidence should Burger testify. *See Harris v. New York*, 401 U.S. 222, 222-26 (1971) (holding that evidence suppressed under *Miranda* may still be used to impeach a testifying defendant). Like the district court, we have no occasion to decide whether the FBI agents violated *Miranda*.

22

25-50976
c/w Nos. 25-51021 and 26-50011

that had your agents acted appropriately when they interviewed him might or might not be admissible. They -- you have given up on that.

You can't defend their conduct and so, you've introduce -- I want to make this clear so the Fifth Circuit has the entire picture of -- look, whatever the Fifth Circuit says for me to do, I'm going to do. You know, I am an inferior court. But I do want the Fifth Circuit to understand that in this unique case, because of the conduct of the FBI in the way they interviewed this defendant, I foresee enormous problems in providing a fair trial to him because what you just said.

Yeah, I get he said it, but he said it in the context of being interviewed for hours and hours without counsel there and, therefore, they're constitutionally infirm. And so, when you go to trial in my opinion -- look, I'm unhappy about everything you've shown me. It disturbs me at a level -- obviously at my level, too, but you know, in trying to guarantee the defendant's constitutional rights to a fair trial and everything that the Constitution provides, I just want to be as clear as I can make it when this goes up immediately after this hearing or down the road that I don't know how it will be possible to really give this defendant a fair trial given the background of it and the conduct by the agents.

At any time, in my opinion, you have thwarted the defendant's ability to take the witness stand or you've certainly prejudiced it because if he gets on the witness stand and says something that you, the government believe is inconsistent with the, how long is it, 12 hours he was interviewed without counsel there, if he says something inconsistent with what he said then, then the Court has to decide whether or not to admit that statement because it's an inconsistent statement. Then the Court has to decide how to let the jury know that it was a statement that was made maybe in the 10th hour of an interview that the Court found shouldn't be admitted and, therefore, how valuable is the statement in terms of impeaching him.

25-50976
c/w Nos. 25-51021 and 26-50011

So I want to express my frustration in terms of coming up with a fair result here, all of that, and the fact that you would try as part of his detention hearing to try and introduce this information that the government did not fight over whether or not a motion to suppress should be granted underscores to me the problem that this case has, and I want to make sure the Fifth Circuit understands if -- whatever they do, if they say I was wrong to dismiss the indictment, they're the superior court and I will faithfully execute a trial and do the best that I can to try and protect the defendant's constitutional rights and to make sure the government can put on a fair case.

*Fourth*, the government complains of a comment the district judge made to the prosecutor at the same bond hearing. The government argued for pre-trial detention at the hearing, but in the alternative proposed a list of conditions that included prohibiting Burger from attending "any organized religious gatherings." Burger's grandfather testified at the hearing that Burger had been attending church weekly with him. When announcing Burger's conditions of release at the end of the hearing, the following exchange occurred:

> [THE COURT:] One of the things you said -- one of the conditions you said was that he should not be allowed into any religious facility. Would the government oppose the defendant from being able to attend church if it was in the company of his grandfather while he was there?

> [PROSECUTOR]: Yes, your Honor, given the fact he wanted to attack a church, we don't believe it would be a safe thing to allow.

> THE COURT: You know, sometimes I just ask questions to measure the credibility of counsel and everything that they say. Sometimes those answers make me happy and sometimes they disappoint me. I'll let you figure out which case that was with your answer.

24

25-50976
c/w Nos. 25-51021 and 26-50011

*Fifth*, the district judge said "I don't care" in response to a statement by the government.  As explained above, we issued an order stating that "nothing prohibits the government, in its discretion, from detaining the defendant or from requesting that the district court impose conditions of release."  Before the hearing, the government filed a document noting its position that the district court lacked jurisdiction to impose conditions of release.  The following exchange occurred at the outset of the hearing:

> THE COURT: Let me tell you the way I interpret this.  The way I interpret this is that the Fifth Circuit is making clear that the government despite the order that I entered dismissing the case because that's been stayed, the Fifth Circuit is making it clear that the government has the right to come in and ask for the defendant to be detained.  I also read this order to say that the Fifth Circuit isn't in the business of determining whether or not he should be detained.  That's up to the district court, which makes complete sense to me. And that if I -- I can choose to grant the government's motion to detain or I can allow the defendant to not be detained as long as I impose the appropriate conditions of release.  That's the way I read the order.
>
> So since it's the government's motion to detain, I will start with the government.
>
> [PROSECUTOR]:  Your Honor, the government reads that order differently than the Court does.
>
> THE COURT: Okay. I don't care.  But again, you need to state your name every time you step up.
>
> [PROSECUTOR]:  Yes, your Honor.  Keith Henneke appearing on behalf of the United States.
>
> THE COURT: Okay. We're here on your motion.  I'm happy to hear your motion.
>
> [PROSECUTOR]:  Our motion was for arrest warrant, your Honor, based on the Fifth Circuit's orders --

25

25-50976
c/w Nos. 25-51021 and 26-50011

THE COURT: Okay. I don't --

[PROSECUTOR]:    We don't believe the Court has jurisdiction to --

THE COURT: Well, I disagree with you. Let me make this clear as I can --

[PROSECUTOR]: May I be heard, your Honor?

THE COURT: I don't need to -- no. I don't need to -- you're welcome to say whatever you want. I have the jurisdiction to make this decision based on this order and that's what I'm going to find. Go ahead and say whatever you care to.

The district judge then let the government make its argument that the district court lacked jurisdiction to order conditions of release because it was Burger—not the government—who was asking for conditions in lieu of detention.

B

We decline to reassign because "[t]he standard for reassignment presents a high hurdle," and we hesitate to exercise this "extraordinary" power. *See United States v. Stanford*, 883 F.3d 500, 516 (5th Cir. 2018). [18]

--------------------------------------

[18]Very recently, in *United States v. Johnson*, No. 25-60479, 2026 WL 625927, at *1 (5th Cir. Mar. 5, 2026), we summarized the tests that this court uses to decide whether to reassign a case on remand:

We have employed two tests "while expressly declining to adopt one test or the other." *In re DaimlerChrysler Corp.*, 294 F.3d 697, 701 (5th Cir. 2002). Under the first test, we consider three factors: (1) "whether the original judge would reasonably be expected upon remand to have substantial difficulty" in putting aside his previously expressed but inappropriate views; (2) "whether reassignment is advisable to preserve the appearance of justice"; and (3) "whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness." *Johnson v. Sawyer*, 120 F.3d 1307, 1333 (5th Cir. 1997) (citations omitted). For the second test, we ask if there is actual bias or an objective appearance of bias. *See M.D. ex rel. Stukenberg v. Abbott*, 119 F.4th 373, 386 (5th Cir.), *cert. denied*, 146 S. Ct. 99 (2025).

The district judge may have been able to make his points and ask his questions without stating that he would acquit if he were on the jury. And he may have noted his concerns with the FBI's interrogation without characterizing any future trial as "impossible." But "expressions of impatience, dissatisfaction, annoyance, and even anger" are "within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display." *Liteky v. United States*, 510 U.S. 540, 555–56 (1994). They do not establish "bias or partiality." *Id.*

We trust that the district judge will set aside his view that "if [he] were on the jury, [he] would acquit [Burger]," especially when determining the legal sufficiency of the evidence to support the jury verdict should Burger be convicted at trial. We take the district judge at his word that he "will faithfully execute a trial and do the best that [he] can to try and protect the defendant's constitutional rights and to make sure the government can put on a fair case." We "will not assume the worst, nor would an objective observer." *Willey v. Harris Cnty. Dist. Att'y*, 27 F.4th 1125, 1137 (5th Cir. 2022).

V

For the foregoing reasons, we REVERSE the district court's order dismissing the indictment and REMAND for further proceedings consistent with this opinion.

The appeal of the district court's order of release pending appeal is DISMISSED AS MOOT.

The motion to consolidate appeals is GRANTED.

All other pending motions are DENIED AS MOOT.

The mandate shall issue forthwith.